In re DARST ET AL., MINORS.

(No. 7034—Decided January 8, 1963.)

*Messrs. Maugan, Vacca & Braun,* for appellant Harold J. Darst.

*Messrs. Chester & Rose* and *Mr. John C. Burkholder,* for appellee Esther Atwood.

*Mr. Earl W. Allison,* prosecuting attorney, and *Mr. Victor Vaile, Jr.,* for the state of Ohio.

DUFFEY, P. J. This is an appeal by Harold J. Darst, father of three minor children, from an order of the Juvenile Court of Franklin County, Ohio, finding the children to be "dependent" under Section 2151.04, Revised Code, and placing them with their maternal grandmother, Esther Atwood. The proceedings are based on an affidavit signed by Mrs. Atwood.

Mr. Darst's first wife died at the birth of their third child on November 30, 1952. As the referral officer's report states, the subsequent arrangements for the care of the children initially arose out of that emergency situation. These arrangements were informal. With Darst's approval, the baby was taken to the Atwood home and has remained there ever since. From 1952 until late 1954, Darst and the two older children spent substantial time in homes provided by Darst and his mother (the paternal grandmother), and also substantial time with the Atwoods.

In the fall of 1954, Darst went to Texas to attend college, and continued in school or working in that area until late 1958. He corresponded with the children and the Atwoods and occasionally sent things, such as at Christmas. After an engagement to be married fell through in 1958, he quit work in Texas and went to Detroit. He visited the children and the Atwoods around Christmas. In January 1959, he remarried and obtained employment in Columbus. He visited the children with some regularity on week ends during 1959. In the fall of that year, he and his wife decided to move to Texas and did so. He continued in contact with the Atwoods. In the spring of 1961, having previously written, he returned to pick up the children and return them to his Texas home.

As to Mr. Darst personally, the evidence indicates one highly derogatory event which occurred about the time of his wife's death. No other similar matter is shown over the succeeding ten years. In 1952 Darst was about twenty-five. His general conduct indicates uncertainty as to his objectives, and it can perhaps be said he acted immaturely from the time of his wife's death until 1958. However, there is no finding by the trial court that his general conduct from 1952 to date rendered him unfit to have custody of the children. He is presently in good physical and mental health.

The relationship between Darst and Mrs. Atwood has been, according to both, very agreeable on practically everything. It is apparent that Darst and the Atwoods shared the support of the children from 1952 until Darst left for Texas in the fall of 1954. From 1954 on, Mrs. Atwood testified that he always sent "something nice" for the children on birthdays and Christmas. But from late 1954 until June of 1956, he provided no funds to the Atwoods. In June of that year, he began sending $15 per week, and in 1958 increased this to $20 per week. This has been paid promptly and regularly ever since. He has also paid a number of miscellaneous bills for shoes, clothing, etc.

Mrs. Atwood testified that neither she nor her husband (now deceased) ever asked for any funds or assistance. Her position seems well summed up in her testimony. "I never complained. * * * I feel that we were able to take care of the girls as well as we did." "We accepted the matter and we went along with him, and we were glad to try to help Harold in any way

that we could." "We never discussed any money that was sent." The referral officer's report states, "she never complained, and he was thankful they could care for the children."

The care and condition of the children from the time of the mother's death to the time of the hearing are well summarized by the referral officer:

"* * * if there ever was a case where the evidence seemed to indicate where the children are being taken care of, where their interests are being served, I believe this is the case. It's very seldom do we have a chance to see such healthy, normal— I'd say above normal, intelligent, good looking children here, well-behaved and well-mannered."

In his opening statement the attorney for the state remarked:

"* * * The thing we are here for is to try to decide what is better for these children. Just to uproot them at this time and take them to Texas, is it best for the children just because he may have some legal rights?"

The referral officer obviously agreed with this view. He felt he was to decide as between the father's home and the grandmother's home "which is in the best interest of the children." In his view, the support, condition and environment of the children provided by the Atwoods were not relevant except as they indicated that the children's best interest lay with the Atwoods.

In a proceeding under Section 2151.04, Revised Code, the state of Ohio itself is asserting a right to the custody, care and control of a child as against the family. In communistic and totalitarian concepts of government and human rights, the state is paramount to the individual and may assert its interest as it sees fit. In our nation, and under Ohio law, the paramount interest in a child rests with the parents and family. The state's rights to interfere must rest upon proof of a substantial interest within constitutional principles and under statutory authority.

It is apparent that the referral officer considered the court's authority to be equal to that in a custody proceeding such as might arise between parents incident to a divorce action. In such a situation the state is forced to act as arbitrator in a family conflict and, both logically and legally, the controlling issue

in custody is the welfare or best interests of a child. However, such a custody proceeding should never be confused with a proceeding by the state itself under Chapter 2151. See *In re Konneker* (1929), 30 Ohio App., 502, at 505. The point is well expressed in an earlier decision of this court. In *Sonnenberg* v. *State* (1931), 40 Ohio App., 475, the court stated, at page 480:

"We do not conceive the purpose of the dependency act to be to require determination of the question which of two suitable homes is the more suitable, or which of two individuals, both fit to have the custody and care of the child, is the more desirable, unless and until it appears that the child is dependent under the statute."

Neither the court nor Mrs. Atwood appears to have recognized that her desire for the children was not in issue. The legal effect of the decree here is to make these children wards of the state. If valid, neither Darst nor Mrs. Atwood has any further interest in the disposition of these children. Control passed to the court to act under Section 2151.35, Revised Code. The court has broad powers over the disposition of children under that statute. However, the second paragraph of Section 2151.35, Revised Code (127 Ohio Laws, 547, 549), provides in part:

"If the court finds that the child is a juvenile traffic offender or is delinquent, neglected, or dependent, it may by order entered proceed as follows:"

It is only "if" the court so finds that the authority granted in that statute can arise. See discussion by Judge Lehr Fess in 33 Ohio Jurisprudence (2d), Juvenile Courts, 63, Section 49, and cases cited therein.

Section 2151.04, Revised Code (129 Ohio Laws, 1778), defines the grounds upon which a child can be found to be "dependent." That statute provides:

"As used in Sections 2151.01 to 2151.54, inclusive, of the Revised Code, 'dependent child' includes any child:

"(A) Who is homeless or destitute or without proper care or support, through no fault of his parents, guardian, or custodian;

"(B) Who lacks proper care or support by reason of the mental or physical condition of his parents, guardian, or custodian;

"(C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming his guardianship;

"(D) Whose parent or parents or legal guardian or custodian have placed or attempted to place such child in violation of Sections 5103.16 and 5103.17 of the Revised Code."

The provisions of this statute proscribe the extent of the court's authority to remove children and place them under the control of the state. Further, the determination that a child is "dependent" must be based on evidence as to conditions *at the time of the hearing. In re Kronjaeger* (1957), 166 Ohio St., 172, paragraph two of the syllabus; *In re Minton* (1960), 112 Ohio App., 361.

Neither the report nor the journal entry reflects any specific basis for the finding of dependency. Under paragraph (A) a child must be at the time (1) homeless, destitute or without proper care or support, and (2) through no fault of the parent or custodian. Obviously, this is not applicable. These children had an excellent home and excellent care.

Paragraph (B) has no application. Obviously, again, there was no lack of care or support. It might be added that the record shows both Darst and Mrs. Atwood were physically and mentally capable of caring for the children.

Under paragraph (C) the children's condition or environment must be such as to warrant interference by the state. Again, the condition of the children at the hearing was and had been excellent. Their environment was equally excellent. Mrs. Atwood's attorney argues, however, that the father, Darst, did not provide that environment. As Judge Fess has stated, any child is dependent in a sense, but under the Juvenile Court laws the *state's* interest under Section 2151.04, Revised Code, arises only if there is no one who is meeting the obligations of care, support and custody which are owed by the parent. 33 Ohio Jurisprudence (2d), Juvenile Courts, Section 30. The fact that relatives are providing that care and support is immaterial to the determination of dependency. See *In re Duncan* (1951), 62 Ohio Law Abs., 173.

It has also been argued that consideration should be given to what the environment would be in the Darst Texas home. Paragraph (C) requires a finding that the environment "is" such as to warrant interference. Whether or not the state *could*

380

be authorized to interfere with family decisions at a time that the child is receiving adequate care, the statute here does not grant such authority. What the children's environment becomes in Texas is for the Texas authorities and not for Ohio to decide.

However, it should be pointed out again that there is no finding that Darst is an unfit parent. The home in Texas is of sufficient size, in a nice area, with adequate facilities for education, and has been approved by the Texas authorities after investigation.

The Juvenile Court has never been given any carte blanche authority to supervise parental decisions. On long-established principles of law, the lower court decision here is an unjustifiable invasion of family affairs and must be reversed.

The judgment below is reversed. An entry dismissing the proceedings may be submitted to this court.

*Judgment reversed.*

McLaughlin and Rutherford, JJ., concur.

McLaughlin and Rutherford, JJ., of the Fifth Appellate District, sitting by designation in the Tenth Appellate District.