**In re STOLL et al.**

[Cite as *In re Stoll,* 165 Ohio App.3d 226, 2006-Ohio-346.]

Court of Appeals of Ohio,
Third District, Van Wert County.

Nos. 15–05–08 and 15–05–09.

Decided Jan. 30, 2006.

---

Kelly J. Rauch, for appellant.

Scott Gordon, for appellee Kara Caldwell.

Eva Yarger, for appellee Dept. of Job and Family Services.

Perry Wise, for appellees Rick and Karla Lamb.

---

ROGERS, Judge.

{¶ 1} Defendant-appellant, Jordan Stoll, appeals the judgments of the Van Wert County Court of Common Pleas, Juvenile Division, granting legal custody of his two sons, Khyler and Khonner Stoll, to their maternal grandparents, Rick and Karla Lamb. On appeal, Stoll contends that the juvenile court erred when it determined that the court did not need to find him unsuitable before placing his two sons with a nonparent. Additionally, Stoll asserts that the trial court erred when it determined that his two sons were neglected and dependent children. Stoll also contends that the trial court erred as a matter of law when it placed his two sons with a nonparent. Finally, Stoll asserts that the trial court erred in determining that placement with the maternal grandparents was in the children's best interest, since that finding was not supported by the evidence. Finding that the trial court erred in determining that Khyler and Khonner were dependent and neglected children, we reverse the judgments of the trial court.

{¶ 2} Prior to the start of the legal proceedings, Kara Caldwell had custody of three children, Khyler and Khonner Stoll and Kiara Lamb. (Hereinafter, Khyler and Khonner will be jointly referred to as "the children.") [1]

{¶ 3} Stoll and Caldwell were married for less than one year. Khyler was born in September 2002, when Stoll and Caldwell were still married but were living apart. Following their divorce in December 2002, Stoll and Caldwell reconciled and lived together for about one year, beginning in January 2003. Toward the end of that time, Caldwell became pregnant with Khonner. After Caldwell became pregnant, Stoll left again, and Caldwell gave birth to Khonner in July 2004. Stoll refused to acknowledge paternity of either Khyler or Khonner until DNA tests were completed. The DNA tests determined for certain that Stoll was the father of both Khyler and Khonner. As a result, Stoll was granted visitation and parenting time with the children and exercised regular visitation, while Caldwell maintained her status as residential parent.

{¶ 4} The Van Wert County Department of Job and Family Services ("DJFS") received calls regarding the children throughout 2004, but did not start an investigation until October 2004. During the October 2004 investigation, DJFS offered Caldwell services because of suspected and potential drug use, but Caldwell refused. DJFS did not file an action at that time, because DJFS did not

---

1. Kiara's father has never been determined, and all parties agreed that Kiara should be placed with the maternal grandparents. As a result, the case before us involves only Khyler and Khonner Stoll.

have any physical evidence. DJFS found that the home and the children were cared for, but DJFS did suspect that the children might be endangered.

{¶ 5} On December 19, 2004, Rick Lamb, Caldwell's father, went to Caldwell's residence in response to a call about frozen pipes. Upon arriving, Lamb found a refrigerator that emanated such a strong odor that it caused him nausea, and he felt that the health of the children was threatened. As a result, Lamb took the children and Caldwell from the residence to his home. Lamb and Caldwell agreed that Caldwell should enter drug rehabilitation. At that time, Caldwell agreed to leave the children in the care of her parents while she was in drug rehab. After dropping Caldwell off at rehab, Lamb returned to Caldwell's residence and found evidence of a methamphetamine ("meth") lab in the garage. Lamb also took video of the residence. Caldwell was released from rehab one day later, and on her way home suffered from anxiety attacks. Lamb, who was driving Caldwell home, called 9–1–1. Emergency medical services took Caldwell back to the hospital and placed her in the psychiatric ward. Caldwell stayed in the psychiatric ward for a couple of days, during which time Lamb and his wife housed and cared for the children.

{¶ 6} On December 22, 2004, about three days after Lamb and his wife had taken the children into their custody, DJFS began an investigation regarding the meth lab and the conditions of Caldwell's residence. Also on December 22, 2004, DJFS filed a complaint in the juvenile court, alleging that the children were neglected and dependent. The next day, a shelter-care hearing was held. Upon the recommendation of DJFS that the children were being properly cared for by the maternal grandparents, Mr. and Mrs. Lamb, the Lambs were given temporary custody. Under the order, Stoll was able to have parenting time with the children.

{¶ 7} In January 2005, Caldwell was charged with the illegal manufacture of drugs. She later pleaded guilty to two counts of illegal manufacture of drugs and has remained in jail, expecting prison or substantial jail time.

{¶ 8} On March 4, 2005, an adjudicatory hearing was held to determine whether the children were dependent and/or neglected children. At the hearing, Stoll objected to both a finding of dependency and a finding of neglect. Stoll argued that there was no evidence that he was not a suitable parent and that the children could therefore be placed with him without a neglect or dependency finding. The guardian ad litem recommended a finding of neglected and dependent. The juvenile court rejected Stoll's argument and found sufficient evidence that Stoll knew or should have known that the children were at risk and that he failed to take any legal steps to protect the children or to take immediate custody.

{¶ 9} As a result, the juvenile court found the children dependent as defined in R.C. 2151.04(B) and (C), because the children lacked proper care or support by

reason of the mental or physical condition of their parents and because their condition and environment were such as to warrant the state, in the interests of the children, in assuming their guardianship. The trial court also found the children neglected as defined in R.C. 2151.03(A)(2), because the children lacked proper parental care due to the faults or habits of the children's parents.

{¶ 10} On March 8, 2005, a dispositional hearing was held. Prior to the dispositional hearing, Stoll filed a motion for legal custody of the children. At the dispositional hearing, DJFS testified that the children should be placed with either the maternal grandparents or Stoll. Caldwell testified that she wanted the children to be placed with her parents. The maternal grandparents requested that all the children be placed with them. The guardian ad litem recommended placement of the children with Stoll and also recommended visitation for the Lambs.

{¶ 11} At the dispositional hearing, Stoll's attorney called both Stoll and his mother to testify. Stoll testified that he had been employed during the time period that the children were born and was currently employed. During his testimony, Stoll also noted that he had a child-support withholding order in place. Stoll testified that he had Khyler on his health plan but that the insurance company would not place Khonner on his plan until a specific court order was made. Stoll testified that he currently lived with his mother in a modern, well-maintained home in Elida, Ohio. Stoll also noted that the home had adequate room and space for the children. Mrs. Stoll testified that she did have pets at her house, and the trial court noted that Khyler may have allergic reactions to the pets but is too young to be tested. Also, the trial court noted that the allergic reaction appeared to be relatively mild.

{¶ 12} Stoll also testified that both he and his mother work during the days, and child care would be required in order to provide for the children. During his testimony, Stoll provided the name of a person near his home who would provide child care. Stoll testified that this person was approximately 23 years old, unmarried, had no children of her own, and did not provide child care for other children.

{¶ 13} Caldwell and Mr. and Mrs. Lamb testified that the Lambs have maintained a close relationship with all of the children. Caldwell testified that the maternal grandparents provided a stabilizing and calming environment for her and her children. Caldwell also testified that her parents visited with the children multiple times a week and most visits occurred at the grandparents' home. Caldwell noted that even prior to the placement of the children in the grandparents' home in December, the children spent a lot of time with the grandparents. Mrs. Lamb testified that she was employed and that Mr. Lamb

was on disability and not employed, but would be able to provide child care for the children.

{¶ 14} Finally, both Caldwell and her parents testified that Stoll was involved in drug use.

{¶ 15} Upon conclusion of all the evidence, the trial court noted that drug use alone does not disqualify a parent and that the trial court was unable to find Stoll "unsuitable." However, the trial court found that it was bound by this court's holding in *In re Osberry*, 3d Dist. No. 1–03–26, 2003-Ohio-5462, 2003 WL 22336115, which affirmed the placement of a child with a nonparent without the determination that the father was unsuitable when the children had been deemed to be neglected and dependent children. The trial court determined that the proper standard for the determination of custody was the best interests of the children. Accordingly, the trial court determined that the best interests of the children would be to grant custody to the maternal grandparents.

{¶ 16} It is from this judgment that Stoll appeals, presenting the following four assignments of error.

### Assignment of Error No. I

The trial court erred when it determined that it did not need to find appellant unsuitable to place Khyler and Khonner Stoll with a non-parent.

### Assignment of Error No. II

The trial court erred when it determined that Khyler and Khonner Stoll were neglected and dependent children.

### Assignment of Error No. III

The trial court erred as a matter of law when it placed Khyler and Khonner Stoll with a non-parent.

### Assignment of Error No. IV

The trial court's determination that it was in the children's best interest to be placed with the maternal grandparents is not supported by the evidence.

{¶ 17} Due to the nature of Stoll's claims, we will address the assignments of error out of order.

### Assignment of Error No. II

{¶ 18} In his second assignment of error, Stoll asserts that the trial court erred when it determined that Khyler and Khonner Stoll were neglected and dependent children. Specifically, Stoll contends that the trial court erred in

finding that the children were either dependent children or neglected children, because Caldwell had voluntarily made arrangements for their care prior to DJFS's involvement. We agree.

■■ {¶ 19} We begin our review of this issue by noting that "[i]t is well recognized that the right to raise a child is an 'essential' and 'basic' civil right." *In re Hayes* (1997), 79 Ohio St.3d 46, 48, 679 N.E.2d 680, citing *In re Murray* (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169. Thus, "a parent's right to the custody of his or her child has been deemed 'paramount'" when the parent is a suitable person. *In re Hayes; In re Murray.* Because a parent has a fundamental liberty interest in the custody of his or her child, this important legal right is "protected by law and, thus, comes within the purview of a 'substantial right.'" *In re Murray.* Based upon these principles, the Ohio Supreme Court has determined that a parent "'must be afforded every procedural and substantive protection the law allows'." *In re Hayes,* quoting *In re Smith* (1991), 77 Ohio App.3d 1, 16, 601 N.E.2d 45, 54. Thus, it is within these constructs that we now examine these assignments of error.

■ {¶ 20} Findings of neglect and dependency must each be supported by clear and convincing evidence. See R.C. 2151.35(A)(1). The Supreme Court of Ohio has held that "[c]lear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and *unequivocal.*" *Cross v. Ledford* (1954), 161 Ohio St. 469, 477, 53 O.O. 361, 120 N.E.2d 118, citing *Merrick v. Ditzler* (1915), 91 Ohio St. 256, 267, 110 N.E. 493. In addition, when "the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross,* 161 Ohio St. at 477, 53 O.O. 361, 120 N.E.2d 118. Thus, we are required to determine whether the evidence was sufficient for the trial court to make its findings by a clear and convincing degree of proof. In order to simplify the distinctions between neglected children and dependent children, we shall discuss each finding separately beginning with the trial court's dependent child finding.

{¶ 21} The term "dependent child" is defined in R.C. 2151.04 and includes any child:

(A) Who is homeless or destitute or without adequate parental care, through no fault of the child's parents, guardian, or custodian;

(B) Who lacks adequate parental care by reason of the mental or physical condition of the child's parents, guardian, or custodian;

(C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship;

(D) To whom both of the following apply:

(1) The child is residing in a household in which a parent, guardian, custodian, or other member of the household committed an act that was the basis for an adjudication that a sibling of the child or any other child who resides in the household is an abused, neglected, or dependent child.

(2) Because of the circumstances surrounding the abuse, neglect, or dependency of the sibling or other child and the other conditions in the household of the child, the child is in danger of being abused or neglected by that parent, guardian, custodian, or member of the household.

{¶ 22} In addition, the determination that a child is a dependent child requires no showing of fault on each parent's part, but focuses specifically "on the child's situation to determine whether the child is without proper (or adequate) care or support." *In re Riddle* (1997), 79 Ohio St.3d 259, 262, 680 N.E.2d 1227.

{¶ 23} The Tenth Appellate District has found that when a child is receiving proper care from relatives to whom the parent has entrusted the child's care, then the child is not a dependent child under R.C. 2151.04. See *In re Crisp* (Feb. 5, 1981), 10th Dist. No. 80AP–678, 1981 WL 2983; *In re Darst* (1963), 117 Ohio App. 374, 379, 24 O.O.2d 144, 192 N.E.2d 287.

{¶ 24} The Supreme Court of Ohio has specifically approved the Tenth District's rationale "at least insofar as R.C. 2151.04(A) is concerned." *In re Riddle,* 79 Ohio St.3d at 263, 680 N.E.2d 1227. In *Riddle,* the court stated, "A child who is receiving proper care pursuant to an arrangement initiated by the parent with a caregiver is not a dependent child under R.C. 2151.04(A)." Id. Since the court's determination in *Riddle* is limited to 2151.04(A), the court has not specifically determined whether the Tenth District's rationale should be applied with respect to R.C. 2151.04(B) through (D). Finding the Tenth District's rationale persuasive, we apply that rationale to the case before us.

{¶ 25} Here, Caldwell voluntarily relinquished control of the children to her parents prior to entering drug rehabilitation. At that point and up until now, both Khonner and Khyler have been receiving proper care, support, and custody from their maternal grandparents. In fact, both the trial court and DJFS found that the grandparents have been able to provide a stable environment where the children feel safe and have been receiving proper care. And as the Tenth District has stated, "[T]he *state's* interest under Section 2151.04, Revised Code, arises only if there is no one who is meeting the obligations of care, support and

custody, which are owed by the parent." *In re Darst,* 117 Ohio App. at 379, 24 O.O.2d 144, 192 N.E.2d 287. In order for Khyler and Khonner to be found dependent children under R.C. 2151.04(B), the children would have to be lacking proper care and support by reason of the mental or physical condition of their parents, but Khonner and Khyler were voluntarily given to their maternal grandparents and have been receiving proper care and support. Thus, R.C. 2151.04(B) has no application. Similarly, when determining dependency under R.C. 2151.04(C), "[T]he children's condition or environment must be such as to warrant interference by the state." *In re Darst,* 117 Ohio App. at 379, 24 O.O.2d 144, 192 N.E.2d 287. The condition at the time of the hearing was and had been adequate, and their environment was equally adequate, because of the Lambs' care. Accordingly, R.C. 2151.04(C) has no application.

{¶ 26} The trial court also found the children to be neglected under R.C. 2151.03(A)(2). R.C. 2151.03(A)(2) provides that a "neglected child" includes any child "[w]ho lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian." Unlike a finding of dependency, which focuses on the condition or environment of the child and not on faults, a neglect case "require[s] an inquiry into the 'faults or habits' of the caregiver." *In re Riddle,* 79 Ohio St.3d at 263, 680 N.E.2d 1227. "The ultimate finding required under R.C. 2151.03(A)(2) is that the child lacks proper (or adequate) parental care due to those faults or habits." Id.

{¶ 27} In *In re Reese,* the Tenth District considered whether a child is neglected when a parent temporarily places the child with a relative through an informal agreement. 4 Ohio App.3d 59, 62, 4 OBR 109, 446 N.E.2d 482. In *Reese,* the Tenth District found that if the relative was providing proper care pursuant to an informal agreement, the child could not be found to be lacking "proper parental care" under R.C. 2151.05, and as a result the child could not be a neglected child. Id. The Supreme Court of Ohio generally accepted this reasoning in *Riddle,* stating that "the parent's voluntary act of temporarily placing the child with a responsible relative is an indicator of proper parental care, and does not support a finding that the parent is at fault. Therefore, the care furnished by the relative can be imputed to the parent." 79 Ohio St.3d at 263, 680 N.E.2d 1227. Additionally, the court in *Riddle* expands the definition of "custodian" and "guardian" in R.C. 2151.03(A)(2) to include nonparents who are able to provide "proper parental care." Id. at 264, 680 N.E.2d 1227.

{¶ 28} In the case before us, Caldwell voluntarily relinquished her control of the children to her parents prior to entering drug rehabilitation. As a result, an "informal agreement" between Caldwell and her parents could be inferred through the actions of both parties. As in *Reese,* the evidence here would support a conclusion that the mother, at the time of the hearing, was not a

suitable custodian for the child. 4 Ohio App.3d at 62, 4 OBR 109, 446 N.E.2d 482. However, following the Tenth District in *Reese,* Caldwell voluntarily placed her children in the care of her parents, who were providing both Khonner and Khyler with "proper parental care." As a result, the children could not be found neglected under R.C. 2151.03(A)(2).

{¶ 29} Because Caldwell voluntarily relinquished custody of the children prior to DJFS's involvement in this case, we cannot find that the children were dependent or neglected. Accordingly, the second assignment of error is sustained.

### *Assignments of Error Nos. I, III, and IV*

{¶ 30} In Stoll's first assignment of error, he contends that the trial court erred when it determined that the trial court did not need to find him unsuitable in order to place Khyler and Khonner with a nonparent. In Stoll's third assignment of error, he contends that the trial court erred as a matter of law when it placed Khyler and Khonner with a nonparent. In Stoll's fourth and final assignment of error, he asserts that the trial court's determination that the best interest of the children would be for them to be placed with the maternal grandparents is not supported by the evidence. Our resolution of Stoll's second assignment of error renders his first, third, and fourth assignments of error moot, and we decline to address them. App. R. 12(A)(1)(c).

{¶ 31} Having found error prejudicial to the appellant herein, in the particulars assigned and argued, we reverse the judgments of the trial court and remand the matters for further proceedings consistent with this opinion.

Judgments reversed
and causes remanded.

BRYANT, J., concurs separately.

SHAW, J., dissents.

BRYANT, Judge, concurring.

{¶ 32} I concur with the majority opinion that the judgment of the Court of Common Pleas of Van Wert County, Juvenile Division, needs to be reversed and remanded for further proceedings. This appeal was brought by the father from a judgment finding the children to be dependent and neglected while in the mother's custody and granting legal custody to the maternal grandparents. The procedure required to grant custody to a nonparent rather than a parent has been addressed by the Ohio Supreme Court in *In re Perales.*

In an R.C. 2151.23(A)(2) child custody proceeding between a parent and a nonparent, the hearing officer may not award custody to the nonparent without

first making a finding of parental unsuitability—that is, without first determining that a preponderance of the evidence shows that the parent abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child. *In re Perales* (1977), 52 Ohio St.2d 89, 6 O.O.3d 293, 369 N.E.2d 1047. See, also, *Reynolds v. Goll* (1996), 75 Ohio St.3d 121, 661 N.E.2d 1008 (holding that parents who are suitable have a paramount right to custody of their children). This reasoning has been applied to other custody disputes between parents and nonparents by this court. See *In re Dunn* (1992), 79 Ohio App.3d 268, 607 N.E.2d 81, *In re Zeedyk* (Nov. 30, 1988), Defiance App. No. 4–87–5, 1988 WL 126768, and *Houser v. Houser* (Aug. 31, 1998), Mercer App. No. 10–98–7, 1998 WL 598104. This court has consistently held that before custody of a child can be given to a nonparent, some evidence of unsuitability of the parents must be presented.

{¶ 33} In this case, a great deal of evidence was presented indicating that the mother was not suitable. However, no evidence was presented that the father was not suitable. The mother and father were divorced and lived in separate households. The mother had residential custody of the children, with the father having only visitation. Thus, any findings of neglect and dependency related to the household applied to the mother only. No evidence was presented that the father had any involvement in the activities that made the mother unsuitable. Although a finding of neglect or dependency may be evidence of a custodial parent's unsuitability, evidence of the neglect or inability of one parent cannot be imputed to the noncustodial parent who does not reside in the household and lacks control of the circumstances. Thus, I believe that the trial court erred in granting custody to a nonparent when no evidence was presented indicating that the father was unsuitable and, in fact, the trial court found him to be suitable.

SHAW, Judge, dissenting.

{¶ 34} Neither R.C. 2151.04 nor R.C. 2151.03 address whether a child who is receiving proper care from relatives to whom the parent entrusted the child's care is deemed not to be a dependent or neglected child. In *In re Riddle*, 79 Ohio St.3d 259, 680 N.E.2d 1227, a children's services board caseworker mediated an agreement to address the child's care when the father acknowledged that he was not providing proper care for his son. A contract was signed by the mother, the father, the paternal grandparents, and the caseworker, explaining the parents' problems regarding their care for their son. Id. Specifically, the Supreme Court held that the child was receiving proper care pursuant to an arrangement *initiated* by the parent with another person. Id. In so holding, the court stated

that "the parent's *voluntary act* of temporarily placing the child with a responsible relative is *an indicator* of proper parental care, and does not support a finding that the parent is at fault. Therefore, the care furnished by the relative can be imputed to the parent." Id. at 263, 680 N.E.2d 1227. (Emphasis added.) The Supreme Court did not determine whether this doctrine should be applied to R.C. 2151.04(B) through (D).

{¶ 35} In the case at hand, none of the factors relied upon in *Riddle* are present. First, Kara Stoll did not *initiate* any arrangement to have her children, Khyler and Khonner, stay with the maternal grandparents. On the contrary, the record reveals that Rick Lamb, Kara's father, came into the home regarding a phone call he received from his son, who was living with Kara, regarding broken water pipes. When he arrived, he shut the water off and entered Kara's home, where he found the house in disarray and smelled a very strong odor near the refrigerator. Once he walked into the living room, he started talking to his son about the smell, and he was told that Kara wanted to go to drug rehabilitation. Rick replied that they were leaving the house and he was taking the grandchildren, because he was concerned about their health due to the smell that was emanating from the refrigerator. Kara and Rick argued, with Rick stating that he was taking the kids and Kara stating that she was not going. Rick then removed the children from the home and informed Kara that if she didn't want to go, then he was going to call the police, because he felt that somebody was going to get hurt in the house. While Kara eventually acquiesced in her parents' taking the children, she did not voluntarily *initiate* this circumstance. In fact, it is the Department of Job and Family Services that first requested an order of temporary custody with the maternal grandparents in its complaint filed on December 22, 2004.

{¶ 36} In addition, there is no evidence as to the alleged "arrangement" for the proper care of the children in this case. On the contrary, and in marked contrast to the contract noted in *Riddle,* the record here demonstrates little more than a spur-of-the-moment, involuntary relinquishment of the children to the grandparents' care due to the insistence of the grandparents during an ongoing crisis. The fact that the relinquishment was eventually agreed to by the parent does not make it rise to the level of a contract or plan, or even to the level of the informal arrangement noted in *Riddle* and the appellate decisions addressing this issue.

{¶ 37} This matter is important because a proper "arrangement" of this nature implies at a minimum some written permission from the parent in order to enable the alternative caregiver to make appropriate decisions—medical, school or otherwise—regarding the children. Thus, a formal guardianship or other form of contract, stating the terms of the arrangement by which the parent was relinquishing her rights to her parents for a certain period of time and for a particular

reason, could be important to the proper care of the children and to the appropriate monitoring of the plan by the children's services agency where necessary.

{¶ 38} However, even assuming that some kind of informal arrangement could be construed in this case, such an agreement should be merely one factor, or as noted in *Riddle, an indicator* for the trial court to consider when determining whether sufficient alternative care was provided for the children by the parent, so as to defeat a complaint for dependency and neglect. In the circumstances before us, it is my opinion that this court should give greater deference to the resolution of this question by the trial court—especially in view of the fact that Kara agreed to a finding of dependency.

{¶ 39} In sum, I cannot find that the trial court erred in determining by clear and convincing evidence, *with the agreement of the parent*, that the children, Khyler and Khonner, were neglected and dependent children and that it was in the children's best interest to be placed with the maternal grandparents. Nor do I find any evidence in this case of a suitable alternative "arrangement" for the proper care of the children "initiated by the parent" sufficient to overturn the decision of the trial court pursuant to the doctrine set forth by the Ohio Supreme Court in *In re Riddle* or the selected appellate decisions cited therein. Accordingly, I respectfully dissent from the majority decision. I would affirm the decision of the trial court.