[Cite as *In re D.J.*, 2014-Ohio-5204.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

IN RE:

    D.J.,                                     CASE NO.  14-14-09

ADJUDICATED NEGLECTED/
DEPENDENT CHILD.                       O P I N I O N

[SHARON RACHEL CARVER –
APPELLANT].

IN RE:

    I.M.,                                     CASE NO.  14-14-10

ADJUDICATED NEGLECTED/
DEPENDENT CHILD.                       O P I N I O N

[SHARON RACHEL CARVER –
APPELLANT].

Appeals from Union County Common Pleas Court
Juvenile Division
Trial Court Nos. 21330038 and 21330039

Judgments Reversed and Causes Remanded

Date of Decision:  November 24, 2014

APPEARANCES:

    *Alison Boggs* for Appellant

    *Rick Rodger*  for Appellee

**WILLAMOWSKI, P.J.**

{¶1} Appellant Sharon R. Carver ("Carver") brings this appeal from the judgment of the Court of Common Pleas of Union County, Juvenile Division, adjudicating her children as dependent. Carver challenges this determination as well as the granting of temporary custody of the children to Appellee the Union County Department of Job and Family Services, Children's Services Division ("the Agency"). For the reasons set forth below, the judgment is reversed.

{¶2} In January of 2000, D.J. was born to Carver and Richard L. Jones ("Jones"). 38R. 1.[1] D.J. has an older sister who is in the custody of Jones. In September of 2009, I.M. was born to Carver and Christopher Muncey ("Muncey"). 39R. 1. On October 10, 2013, the Agency filed two complaints alleging that D.J. and I.M. were neglected children pursuant to R.C. 2151.03 and were dependent children pursuant to R.C. 2151.04(A), (B), and (C). 38R. 1 and 39R. 1. The complaints alleged that Carver lacked stable housing, suffered from mental health issues, and had previously voluntarily agreed to place the children in the temporary care of the Agency. *Id.* The Agency stated that the children were voluntarily living with relatives at the time of the complaint. *Id.* No specific date for dependency was alleged in the complaint. *Id.* The Agency filed motions for temporary custody of the children. 38R. 2 and 39R. 2. A hearing was set for

---

[1] As there are two different records and they are not identical, items filed in D.J.'s case will be identified as 38R. Items filed in I.M.'s case will be identified as 39R.

-2-

October 23, 2013, regarding the motions for temporary custody. 38R. 8. And 39R. 8. On October 17, 2013, Richard Mickley was appointed as the guardian ad litem ("GAL") for the children. 38R. 11 and 39R. 11. A pre-trial hearing was held on October 23, 2013, and Carver was notified of her rights at that time. 38R. 14 and 39R. 13. At the hearing, Carver agreed to the motions and temporary custody of the children was awarded to the Agency. 38R. 15and 39R. 14.

{¶3} On November 8, 2013, the trial court *sua sponte* continued the adjudicatory hearing beyond the initial 30 days and scheduled the hearing for December 17, 2013. 38R. 20 and 39R. 19. Carver notified the trial court of her new address on November 15, 2013. 38R. 22 and 39R. 21. On November 21, 2013, counsel for Carver was appointed. 38R. 29 and 39R. 28. On December 11, 2013, Jones filed a motion for a continuance due to a schedule conflict his counsel had with the hearing date. 38R. 46 and 39R. 42. The trial court granted the motion for a continuance and rescheduled the adjudicatory hearing for January 6, 2014. 38R. 48 and 39R. 50. The paternal grandmother, Judy Gray ("Judy") and her husband, Charlton Gray ("Charlton") filed a motion to intervene on December 13, 2013. 39R. 44. The trial court granted this motion for the purposes of temporary orders and disposition on December 13, 2013. 39R. 45. On January 3, 2014, Jones filed a motion for custody of D.J. 38R. 49.

{¶4} The adjudicatory hearing was held on January 6, 2014. In support of its complaint for adjudication of D.J. as neglected and dependent, the Agency presented the testimony of four witnesses. The first witness was Molly Vance ("Vance"), who was an intake worker for the Agency. Adj. Tr. 9. Vance testified that she first became involved with Carver and her children in July of 2013, when Licking County requested that she meet with Carver and report back what she learned. Adj. Tr. 10-11. Vance's next involvement with the family occurred on August 16, when D.J.'s older sister attempted suicide, was hospitalized, and refused to return to Carver's home upon her release. Adj. Tr. 11. As a result of that case, there was a court hearing on September 25, 2013, which sent D.J.'s older sister to live with Jones and moved D.J. from Jones' home to live with Carver. Adj. Tr. 12. Vance then testified that after the court hearing, a new report was received that same day concerning Carver's lack of housing and inability to care for D.J. at that time. *Id.* After the report, Vance spoke with Carver concerning the report. Adj. Tr. 13. During the conversation on September 26, 2013, Carver told Vance that "she couldn't live where she was living and that she had to find someplace else to live and didn't have any place at that time." Adj. Tr. 27. Vance then arranged for Carver and her to get together to look for housing. *Id.* Carver told Vance that she was moving out of her current home and would be staying with her brother along with the children. Adj. Tr. 14. The children were

then moved to Carver's brother's home that same day. *Id.* At the time the children came into the care of the Agency, they had no delays of any kind and D.J. was attending school. Adj. Tr. 16. D.J. was described as doing well in school and achieving good grades. *Id.* I.M. was too young for school at that time. *Id.* Vance also testified that Carver had told her that Carver has post-traumatic stress disorder ("PTSD"). Adj. Tr. 17.

{¶5} On cross-examination, Vance admitted that she was testifying as to what had been reported to her as she did not have personal knowledge of Carver's situation on September 25, 2013, because she was not present. Adj. Tr. 21. Vance also testified that Carver was staying somewhere as she was not in a homeless shelter or living out of her car. Adj. Tr. 22. From August through September 25, D.J. had been living with Carver and I.M. and they had a residence. Adj. Tr. 23. The children were always dressed appropriately and there were no indications that they were malnourished. *Id.* As of the morning of September 25, 2013, when the Agency closed the prior case involving D.J.'s older sister, the Agency had no concerns about dependency. Adj. Tr. 25. After Carver told Vance they would stay with Carver's brother, there were no concerns that the children lacked appropriate housing, food, or clothing. Adj. Tr. 29. As of the filing date, the children were living in appropriate housing as they were living with Carver's brother. Adj. Tr. 31-32.

**{¶6}** The second witness for the Agency was Jason Roberts ("Roberts"), who was a registered nurse at Union County Memorial Hospital. R. 32. Roberts testified that he was working the night of September 25, 2013, when Carver came into the emergency room. R. 33. He described Carver's behavior as "alarming." *Id.* Roberts testified that when he went to give Carver her medicine, "she was real shaky, fidgety, didn't act like she knew where she was." Adj. Tr. 35. Roberts also testified that Carver was cursing at the children and the staff. *Id.* According to Roberts, the situation became so concerning that security guards were called and the children were crying. Adj. Tr. 36. Roberts testified that hospital staff had to feed the children because they were hungry. Adj. Tr. 37.

**{¶7}** Brittany Bunce ("Bunce") testified that she was an on-going caseworker with the Agency. Adj. Tr. 42. Bunce testified that she was on call the evening of September 25, 2013, and was the caseworker who went to the hospital to meet with Carver. Adj. Tr. 43. Bunce went to the hospital because she was told that Carver "was acting inappropriately and couldn't care for her children and [the hospital staff] were questioning [Carver's] mental state and ability to care for them." Adj. Tr. 43-44. When Bunce arrived at the hospital, she heard Carver "screaming and yelling and crying" and there were multiple security guards outside of her room. Adj. Tr. 44. Bunce questioned Carver as to why she was at the hospital and was told that Carver had injured her wrist. Adj. Tr. 45. When

asked about her mental health, Carver told her that she suffered from PTSD. *Id.* Carver denied receiving treatment for the PTSD. *Id.* I.M. and D.J. were in the room with Carver. *Id.* I.M. was sitting on a chair at the end of the bed and D.J. was standing at the head of the bed. *Id.* According to Bunce, Carver "kept spacing out" and D.J. had to answer the majority of the questions. *Id.* When Bunce tried to speak with Carver about an Out-of-Home Safety Plan, Carver would stare off into space for 45 to 60 seconds, before having to be prompted as to the conversation. Adj. Tr. 45-46. D.J. had to answer the majority of the questions on the child care agreement, such as those relating to allergies and medication. Adj. Tr. 46. The children had to be placed in foster care that night because no one was sure how long Carver would be at the hospital. Adj. Tr. 47. The children were already stating they were tired and it was very late. *Id.* Bunce attempted to learn of a relative placement so that D.J. could get some sleep before school the next day. Adj. Tr. 48. However, Carver was unable to think of any family member who could watch the children at that time. *Id.* Carver stated that it would be best to do a voluntary placement at that time. *Id.* Bunce then went to get the paperwork from her car. *Id.* When she returned, Carver suggested they call her brother and his wife. *Id.* Carver made the call, but there was no answer, so Bunce took the children to a temporary foster care home. Adj. Tr. 49.

{¶8} On cross-examination, Bunce testified that Carver did not scream after she entered the room at the hospital. Adj. Tr. 51. Bunce admitted that she went into the hospital with the plan that Agency would assist in finding a place for the children that night, whether with a kinship placement or a foster care placement. Adj. Tr. 54.

{¶9} Patricia Williams ("Williams") was the Deputy Director for the Agency. Adj. Tr. 57. Williams testified that as of October 10, 2013, Carver was not able to provide a home for the children. Adj. Tr. 61. The Agency had agreed to pay some application fees for housing, but Carver, at that time, had not followed through with submitting the applications. *Id.* Williams was not aware of whether Carver had applied for any type of assistance. *Id.* Williams testified that as of the date of the complaint, the children were dependent because Carver did not have a place to live.[2] Adj. Tr. 65. On cross-examination, Williams admitted that she had no direct knowledge of how Carver acted while at the hospital. Adj. Tr. 67. Williams testified that Carver had not asked to have custody of the children returned to her. Adj. Tr. 68.

{¶10} During the testimony of Williams, the magistrate noted some unusual behavior by Carver.

> **The Court: Mr. Peistrup, is your client all right? She's been sitting for, at least, four minutes with her eyes closed and her**

---

[2] Williams did not testify that the children were neglected as set forth in the complaint.

> **mouth moving and I want to make a record of it because she's kind of exhibiting some odd behaviors in Court here today. Is she okay?**
>
> **Mr. Peistrup: She's fine, Your Honor.**

Adj. Tr. 71. Later in the hearing, Carver's attorney pointed out that Jones had been making very "inappropriate facial commentary." Adj. Tr. 89. Carver then stated that Jones' behavior was why she had closed her eyes earlier while sitting near him. Adj. Tr. 90. The magistrate ordered Jones to stop his behavior. *Id.*

{¶11} After the Agency presented its case, Carver made a motion to dismiss the complaint on the basis that the Agency failed to prove by clear and convincing evidence that the children were neglected or dependent. Adj. Tr. 77. The motion was overruled and Carver then testified on her own behalf. Adj. Tr. 79-80.

{¶12} Carver testified that she is the mother of the children. Adj. Tr. 81. On the morning of September 25, 2013, Carver went to court concerning the custody of her oldest daughter and was suffering a great deal of anxiety because of that. *Id.* Carver testified that her relationship with Jones was poor and that he had been abusive towards her. Adj. Tr. 82. As a result of this, Carver had obtained protection orders to keep Jones away from her. Adj. Tr. 84. After the hearing, Carver had a doctor's appointment and then had to take D.J. to her counseling appointment. Adj. Tr. 82. Earlier in the day, she had injured her wrist and it was

causing her pain. *Id.* After D.J.'s appointment, Carver's mother was not there to pick them up, so Carver and D.J. began walking towards the mother's home. Adj. Tr. 85. Carver twisted her ankle while walking and fell on the injured wrist. *Id.* Carver wanted D.J. to go on to the mother's home and get help, but D.J. insisted that they go to the hospital to have Carver's injuries examined. *Id.* Eventually, Carver's mother arrived in the car with I.M., and took Carver to the hospital. Adj. Tr. 86. Carver did not wish to go to the hospital, but everyone else insisted, so they went to the emergency room. *Id.* Prior to this, D.J. had been fed breakfast at home, lunch at school, and a couple of snacks after school. *Id.* I.M. had been fed throughout the day as well. However, Carver admitted that the children had not yet had dinner. *Id.*

{¶13} When they arrived at the hospital that night, Carver's mother dropped Carver, D.J., and I.M. off at the door and then drove away. Adj. Tr. 87. Carver testified that the doctor came in and made some comments about her parenting. *Id.* Carver admitted that she said "some rude stuff" and raised her voice, but she denied cursing at D.J. or the hospital staff. *Id.* According to Carver, she was arguing with D.J. because D.J. had previously been grounded from her ipod, but was playing with it in the hospital. *Id.* Carver also testified that she was in pain and that the pain was being aggravated by I.M. jumping on the bed in which she was lying. Adj. Tr. 88. When Bunce arrived, Carver was terrified.

Carver testified that she thought that they would not let her leave the hospital unless she allowed D.J. and I.M. to go with Bunce. Adj. Tr. 90. Carver stated that she kept closing her eyes and "zoning off" to think and figure out what to do because she did not understand what was happening. *Id.* As soon as she signed the paperwork to allow Bunce to take the children, the hospital agreed to release her. Adj. Tr. 91. From the hospital, she went back to the home where she lived. *Id*

{¶14} The next day, Carver went to her brother's home to prepare a space for the children and herself. Adj. Tr. 90. Then she returned to her home to start packing up their belongings. Adj. Tr. 91. The children went to stay with Carver's brother on September 26, 2013, and Carver was supposed to follow a few days later. Adj. Tr. 93. However Carver was never allowed to move in with the children. Adj. Tr. 94. Carver testified that her sister-in-law called her and told Carver that they (the brother and sister-in-law) did not want her to move in because they did not want Carver "judging their parenting skills". Adj. Tr. 95. The children were still allowed to stay there though. *Id.* Carver testified that she did not feel that she could take the children out of her brother's home because the Agency had made it clear that if she did, the Agency would take custody of the children. *Id.*

{¶15} On cross-examination, Carver admitted that she "voluntarily under duress" signed the voluntary custody agreement. Adj. Tr. 98. Carver testified that her mother did not take D.J. and I.M. from the hospital because she was worn out from helping Carver all day and having I.M. with her that evening. Adj. Tr. 100. Carver also admitted having a disagreement with the doctor and that security was there. Adj. Tr. 103. Carver also admitted that as of October 10th, she did not have her own home, was living with her mother, and that her children could not have stayed there long-term. Adj. Tr. 105.

{¶16} After all the evidence was presented, the magistrate took a few moments to consider it. Adj. Tr. 118-19. The magistrate then made the following findings.

> **With regard to both children, the Court does not find that the Agency's proved by clear and convincing evidence that they're neglected. So, I'm dismissing both of those allegations. Dependency is where I got stuck because, certainly, they're not – they are homeless because of the testimony I heard and I find that by clear and convincing evidence but I don't find that it's through no fault of the parents, guardians or custodians.**
>
> **Certainly, I heard testimony that [Jones] has only visited with [D.J.] twice and that there were application fees paid for [Carver] and that she didn't follow up on them to alleviate the homelessness, so I can't find a no fault there.**
>
> **I didn't hear enough testimony or evidence to make a finding that anything that occurred was by reason of mental or physical condition because I didn't hear that nexus, so I'm down to the last dependency section. Whose condition or environment such to warrant the State in the interest of the child in assuming**

> **Guardianship the Court does find by clear and convincing evidence that the Agency proved that element and so, therefore, the Court adjudicates both children dependent.**

Adj. Tr. 119-20. The magistrate also noted that the "odd" behavior of Carver at the hearing was also a basis for the finding of dependency. Adj. Tr. 121. The written magistrate's decision adjudicating D.J. as a dependent child was filed on January 16, 2014. 38R. 72 and 39R. 75. The trial court approved this decision on January 22, 2014. 38R. 73 and 39R. 76.

{¶17} On January 6, 2014, prior to the adjudicatory hearing, the Agency filed its case plan. 38R. 53 and 39R. 56. The case plan listed the following strengths among others: 1) Carver had a strong desire to be reunified with the children and regularly attends visitations; 2) D.J. was old enough to recognize abuse and had the ability to report it; 3) Carver's mother was willing to supervise visitations with Carver outside of the Agency; 4) D.J. was well behaved and was passing all of her classes; 5) the children were both physically healthy; 6) both children showed normal physical, cognitive, and social development; and 6) the children had a strong bond and interacted healthily. *Id*. The concerns that related to Carver were 1) she needed to obtain and maintain appropriate housing and 2) she needed counseling to address her PTSD. *Id.* The case plan indicated that Carver did not agree with the plan as it related to visitation. *Id*.

-13-

{¶18} Also on January 6, 2014, the GAL filed his report. 38R. 56 and 39R. 59. The GAL indicated that D.J. regrets choosing to live with Carver and would prefer to live with Jones. *Id*. at 2. I.M. indicated that he wanted to live with Carver. *Id*. The GAL indicated that Carver has issues with control and recommended that she obtain the following: 1) mental health assessment and counseling; 2) a referral to the employment resource center; 3) parenting classes; 4) budgeting and management classes; and 5) a referral for housing. *Id*. at 3. The GAL recommended that temporary custody be left with the Agency, but directed that placement during the interim should be at the discretion of the Agency. *Id*.

{¶19} The dispositional hearing was held on January 7, 2014. 38R. 75 and 39R. 78. The magistrate filed her decision on January 16, 2014. *Id*. The magistrate recommended temporary custody of the children to the Agency, but indicated that I.M. could be placed with his paternal grandmother. D.J. was not allowed to be placed with Jones and Carver was granted supervised visits only. *Id*. The trial court approved the decision of the magistrate on January 22, 2014. 38R. 76 and 39R. 78. On February 10, 2014, Carver filed her objections to the magistrate's decisions. 38R. 80 and 39R 83. Carver claimed 1) the magistrate should not have granted the motion of Judy and Charlton to intervene; 2) the Agency failed to prove that the children were neglected or dependent; 3) the magistrate improperly considered Carver's demeanor in the hearing as a basis for

the adjudication of dependency; 4) the magistrate erred in finding that Carver's counselor had testified that the children should not be placed with Carver; and 5) the magistrate had no basis for ordering that Carver's visitation be supervised and by not returning the children to Carver. *Id.* The trial court overruled the objections on April 17, 2014. 38R. 90 and 39R. 90. Carver filed her notices of appeal on May 8, 2014. 38R. 95 and 39R. 95. On appeal, Carver raises the following assignments of error.

### First Assignment of Error

**The trial court's decision to uphold the magistrate's finding of dependency was against the manifest weight of the evidence and amounted to an abuse of discretion.**

### Second Assignment of Error

**The magistrate inappropriately considered [Carver's] actions in court as part of the reason to find the children were dependent.**

### Third Assignment of Error

**The magistrate erred in ruling at disposition that [Carver] had to have supervised visitation with her children instead of returning the children to her while the case plan was being worked.**

### Fourth Assignment of Error

**The Agency failed to use reasonable efforts to avoid removal of the children from the home and prevent the children from going into foster care.**

{¶20} In the first assignment of error, Carver claims that the finding of dependency was against the manifest weight of the evidence. A juvenile court has original jurisdiction "[c]oncerning any child who on or about the date specified in the complaint * * * is alleged to * * * [be a] dependent child * * *." R.C. 2151.23(A)(1).

> **As used in this chapter, "dependent child" means any child:**
>
> **(A)  Who is homeless or destitute or without adequate parental care, through no fault of the child's parents, guardian, or custodian;**
>
> **(B)  Who lacks adequate parental care by reason of the mental or physical condition of the child's parents, guardian, or custodian;**
>
> **(C)  Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]**

R.C. 2151.04. A trial court's adjudication of a child as dependent must be supported by clear and convincing evidence. R.C. 2151.35(A). In addition, the determination as to whether a child is dependent must be made as of the date alleged in the complaint, not as of the date of the adjudicatory hearing. R.C. 2151.23(A)(1) legislatively overruling *In re Kronjaeger*, 166 Ohio St. 172, 140 N.E.2d 773 (1957); *In re Alexander C.*, 164 Ohio App.3d 540, 2005-Ohio-6134, 843 N.E.2d 211 (6th Dist.); *In re Rowland*, 2d Dist. Montgomery No. 18429,

2001 WL 109182 (Feb. 9, 2001); and *In re Sims*, 13 Ohio App.3d 37, 468 N.E.2d 111 (1983).

> **[A] consideration of the "best interests" of the child should not enter into the initial factual determination of dependency. It becomes a proper focus only when the emphasis has shifted to a consideration of the statutorily permissible dispositional alternatives.**

*In re Cunningham*, 59 Ohio St.2d 100, 107, 391 N.E.2d 1034 (1979).

{¶21} In this case, a review of the record indicates that no specific dates were alleged in the complaints. The complaints instead merely discussed the past history and indicated that Carver had voluntarily agreed to have the children live with her brother. The Agency merely stated that it was "necessary that the Agency remain involved." The only specified date is that a prior case was closed on September 25, 2013. The complaint then goes on to say that the Agency then received another report regarding the well-being of the children and then proceeds to talk about the prior case. No specific date was alleged. Thus, the only date for the trial court to use is the filing date of the complaint, i.e. October 10, 2013. See *Rowland, supra* (holding that when the Agency fails to allege a specific date, the operative date necessarily becomes the date of the filing of the complaint).

{¶22} A review of the evidence presented at the adjudicatory hearing indicates that Carver was residing with her mother on October 10, 2013, and the children would not have been able to stay with her at that location for a long

period of time. However, the children, as of October 10, 2013, were residing with her brother and that placement was acceptable to the Agency. There were no concerns that the children were dependent at that time.[3] This court, in a plurality opinion, has previously held that when children are receiving proper care from relatives to whom a parent has entrusted the children, the children are not dependent under the statute. *In re Stoll*, 165 Ohio App.3d 226, 2006-Ohio-346, 845 N.E.2d 581 (3d Dist.). *See also*, *In re Myers*, 3d Dist. Seneca No. 13-06-48, 2007-Ohio-1631 (recognizing the holding of *Stoll*, but distinguishing it because the child was no longer in the care of the relatives); *In re Riddle*, 79 Ohio St.3d 259, 680 N.E.2d 1227 (1997) (holding that child placed voluntarily by parent with caregiver who is supplying proper care is not a dependent child, but may be a neglected child); *In re Crisp,* 10th Dist. Franklin No. 80AP-678, 1981 WL 2983 (Feb. 5, 1981) (holding that child receiving care and support from a relative is not dependent); *Johnson v. Johnson*, 10th Dist. Franklin No. 00AP-691, 2001 WL 277272 (Mar. 22, 2001); and *In re A.O.*, 8th Dist. Cuyahoga No. 100619, 2014-Ohio-2277 (holding that children receiving proper care from relatives with whom the parent entrusted the children are not dependent). The Agency presented no evidence that the voluntary placement of the children with Carver's brother and

---

[3] This court does not dispute that after the filing date, there were substantial other events that may have supported a filing for dependency or neglect.. However, the determination of dependency must be made as of the date of the complaint, not as of the date of the hearing. Thus, any events happening after the time of the filing would be considered for the purposes of determining disposition, but are not relevant to the issue of adjudication.

sister-in-law by Carver was anything but appropriate. To the contrary, the evidence indicated that the children were well-cared for and the environment was good. Thus, at the time of the filing of the complaint, there was no evidence that the children were dependent. The fact that things went poorly later may support the filing of another complaint at a later date, but not as of October 10, 2013. The trial court therefore erred in finding the children to be dependent as of October 10, 2013.[4] The first assignment of error is sustained.

{¶23} Since this court has sustained the first assignment of error concerning the adjudication of the children as dependent, the next three assignments of error are moot. Thus, this court will not address them. App.R. 12(A)(1)(c).

{¶24} Having found error prejudicial to the appellant, the judgments of the Court of Common Pleas, Juvenile Division, are reversed and the matter is remanded for further proceedings.

*Judgments Reversed and*
*Causes Remanded*

**ROGERS, J., concurs.**
**PRESTON, J., dissents.**

**/jlr**

---

[4] As there was no testimony that the children were neglected, Williams herself testified they were not neglected, and the trial court found that they were not neglected, we will not address that question.