[Cite as *In re S.A.*, 2012-Ohio-3394.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE   COUNTY

IN THE MATTER OF:                        :
                                         :        Appellate Case No. 2011-CA-66
          S.A.                           :
                                         :        Trial Court Case No. S38598
                                         :
                                         :        (Juvenile Appeal from Greene County
                                         :        Juvenile Court)
                                         :
                                         :
                              . . . . . . . . . . .

O P I N I O N

Rendered on the 27th day of July, 2012.

. . . . . . . . . . .

STEPHEN K. HALLER, Atty. Reg. #0009172, by NATHANIEL R. LUKEN, Atty. Reg.
#0087864, Greene County Prosecutor's Office, 61 Greene Street, Xenia, Ohio 45385
          Attorney for Plaintiff-Appellee

JENNIFER S. GETTY, Atty. Reg. #0074317, Getty Law Office, L.L.C., 46 East Franklin
Street, Centerville, Ohio 45459
          Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1}     A.M. ("Mother") appeals from the trial court's judgment entry adjudicating

her minor child S.A. dependent and awarding legal custody to the child's paternal aunt, T.M.

("Paternal Aunt").

{¶ 2}     Mother advances three assignments of error on appeal. First, she contends the trial court erred in adjudicating S.A. dependent under R.C. 2151.04. Second, she asserts that the trial court erred in awarding Paternal Aunt legal custody. Third, she claims the trial court erred in finding that her drug use renders her unable to provide adequate and consistent care for S.A.

{¶ 3}     The record reflects that Greene County Children Services ("GCCS")  filed a complaint in July 2011, alleging that five-year-old S.A. was a neglected child under R.C. 2151.03 and a dependent child under R.C 2151.04. (Doc. #2). The basis for the complaint was Mother's repeated drug use and a lack of supervision. The complaint included a request for permanent custody or, alternatively, for temporary custody. Thereafter, in September 2011, Paternal Aunt moved for legal custody of S.A. (Doc. #49). That same month, a guardian ad litem filed a report that recommended granting legal custody to GCCS. (Doc. #54).

{¶ 4}     The case proceeded to an October 5, 2011 adjudicatory hearing. GCCS presented four witnesses. The first was Tessa Zimmer, a Montgomery County Children Services ("MCCS") investigator. Zimmer testified that she had received a referral about Mother on May 10, 2011, when Mother was residing in Montgomery County. The complaint involved allegations that Mother was pulling S.A.'s hair, hitting the child, and caring for her children "while under the influence." (Tr. Vol. I at 13). Zimmer met with Mother several times and also spoke to Mother's children. Mother's home was clean, she was bonded with her four children, and the allegations were not substantiated. (*Id*.). At that time, Mother failed to comply with a request for a urine screen. (*Id.*).

{¶ 5}     MCCS received another referral on or about June 23, 2011. That complaint

involved five-year-old S.A. and another one of mother's children, two-year-old A.G., being found unsupervised two and one-half blocks down the street riding a tricycle. (*Id.* at 13-14). When questioned, Mother claimed the children were staying with grandparents at the time. Zimmer determined that Mother's claim was untrue. The children had been returned home several days before the incident. (*Id.* at 15). As a result, Zimmer substantiated an instance of neglect.

{¶ 6}    MCCS received a third referral on July 1, 2011. The complaint involved D.T., a former foster parent for A.G., bringing the child to the hospital with a "MRSA" bacterial infection. (*Id.* at 16). Hospital employees reported that Mother appeared intoxicated while at the hospital. (*Id.*). In the days after the incident, D.T. tried to contact Mother several times. She discovered, however, that Mother had moved to Greene County. (*Id.* at 18). As a result, the referral was transferred to GCCS. (*Id.* at 19).

{¶ 7}    The next witness was L.I., an "off and on" foster parent for S.A. since the child's infancy. (*Id.* at 31). L.I. testified that S.A. had been placed in her home several times when children services obtained temporary custody of the child. Each time, Mother successfully regained custody after battling drug addiction. Mother continued to allow S.A. to have regular visitation with L.I., even after regaining custody, because of the strong bond between L.I. and the child. (*Id.* at 32).

{¶ 8}    L.I. testified that in June 2011 Mother admitted to her that she was using heroin again. (*Id.* at 36). Mother asked L.I. to keep S.A. for a couple of weeks so she could try to break the addiction on her own. (*Id.* at 36-37). L.I. testified that she saw Mother under the apparent influence of drugs while in S.A.'s presence in early July 2011. (*Id.* at 38-39, 52). Mother was "fading in and out of the conversation," she was "swaying," and her "eyes were

fading down." Mother's "head fell over to the side and she started drooling out of her mouth." (*Id.* at 38). S.A. witnessed Mother's behavior and began crying. (*Id.* at 62). Concerned for S.A.'s well-being, L.I. obtained Mother's permission to take the child home with her. (*Id.* at 39). On that occasion, one of Mother's friends, T.P., was present in the home and got A.G. ready for bed. (*Id.* at 39, 42). T.P. also cooked S.A. and A.G. dinner around 10:00 p.m before L.I. took S.A. away. (*Id.* at 42).

{¶ 9} L.I. additionally testified about taking S.A. to the hospital when A.G. was being treated for the MRSA infection. L.I. continued to be concerned about Mother's drug use at that time because she saw "track lines everywhere" on Mother's arms. (*Id.* at 41-42). Mother admitted to L.I. that she was struggling "to get off the drugs." (*Id.* at 42).

{¶ 10} L.I. recalled that on another occasion in the same time period someone called her "to come and get [S.A.] for a couple of weeks so that [Mother] could get clean." (*Id.* at 43). When she arrived at Mother's home, L.I. found A.G., S.A., and Mother's two older children home alone. (*Id.*). A.G. and S.A. were inside the house in bathing suits, while the two older children, the oldest of whom was 12 years old, were playing on a slip-and-slide in the backyard. (*Id.* at 44, 55). Mother didn't arrive home until twenty to thirty minutes later. She admitted to L.I. "that she had been using and that she wasn't happy; she wanted to get off of the drugs and just needed to get * * * some help." (*Id.* at 45). At that point, Mother agreed to let L.I. keep S.A. until mother "got well." (*Id.*). Mother later contacted L.I. and asked for S.A. to be returned. (*Id.* at 56).

{¶ 11} The next witness at the adjudicatory hearing was D.T., who previously had served as a foster parent for two-year-old A.G. D.T. testified that Mother called on June 1, 2011, and asked her to take A.G. for two weeks because Mother had relapsed on heroin and

needed time to stabilize. (*Id.* at 70). D.T. returned A.G. to Mother's care on June 17, 2011, but did not see Mother when she dropped the child off. D.T. believed Mother was avoiding her. (*Id.* at 71). D.T. subsequently received another call to pick up A.G. on June 22 or June 23, 2011, and she kept the child for the rest of that month. (*Id.* at 73).

{¶ 12} Around the end of June 2011, D.T. took A.G. to the hospital because the child was having severe stomach pains. During an examination, doctors discovered that the child had a MRSA infection. (*Id.* at 74). D.T. had A.G. admitted to the hospital on July 1, 2011. D.T. was unable to reach Mother until later that day, however, and had some trouble admitting the child herself. D.T. eventually reached Mother, who arrived at the hospital that night. (*Id.* at 75-76). Mother was dressed in long sleeves and sweat pants, despite the warm temperature. She also was acting oddly, making "quick movements, not really focused, kind of not finishing sentences." (*Id.* at 76). D.T. returned to the hospital a day or two later to visit A.G. Upon arriving, D.T. saw Mother outside the hospital with a friend. D.T. proceeded to A.G.'s room and found Mother's four children there unsupervised. (*Id.* at 78).

{¶ 13} D.T. received another call to pick up A.G. on July 11, 2011. (*Id.* at 79). With Mother's permission, D.T. kept the child until returning from a family vacation on July 22, 2011. (*Id.* at 80-81). At that time, GCCS received temporary custody because a dependency action had been filed. (*Id.* at 81).

{¶ 14} The final witness for GCCS was Amy Amburn, an assessment supervisor for the agency. Amburn testified that she received a referral in July 2011, and the case was transferred to her from MCCS. (*Id.* at 121-122). Amburn had concerns about Mother's reported drug use and her ability to care for her children. Amburn explained: "The concerns were based on information that was provided from Montgomery County Children Services,

information that we had in the past, information that was provided through [Mother] in regards that she was using, and that our concern was that she can pick up the children at any time and if she was using they would be at risk." (*Id.* at 123).

{¶ 15} Amburn explained that GCCS had been involved with Mother and her children since 2000. Amburn personally had been involved with Mother and with the removal of children from her home twice since 2004. (*Id.*). Among other things, Amburn mentioned two referrals involving allegations of sexual activity between Mother's children. Those allegations were not substantiated. (*Id.* at 124).

{¶ 16} Amburn admitted that Mother did an "excellent" job taking care of her children when she was not using drugs. (*Id.* at 126). Amburn did not believe Mother could care for her children, however, when she was using drugs. (*Id.*). Amburn expressed concern about the children seeing Mother use drugs. (*Id.*). Following Amburn's testimony, GCCS rested its case in the adjudicatory phase.

{¶ 17} Mother then presented testimony from her boyfriend, A.H. He denied that S.A. and A.G. were left unattended down the street from their home. (*Id.* at 144-145). He also testified that he never found Mother alone with the children while she was under the influence of drugs. (*Id.* at 148). A.H. explained that he and Mother had arranged for the children to stay elsewhere while she attempted to deal with her addiction. (*Id.*). A.H. admitted finding some needles in a house he had shared with Mother and the children. He did not know, however, whether the needles were Mother's or whether they had been left by the prior resident. (*Id.* at 151). Before even moving in, he had found the needles under a box that belonged to the prior resident. (*Id.*). After moving in, he found more needles in a box in the garage. (*Id.* at 152). A.H. admitted seeing Mother with needles around August 21, 2011. On that occasion, the

police were called and she went to jail. (*Id.* at 153). That incident occurred after GCCS already had removed the children from her home. (*Id.*).

{¶ 18} On cross examination, A.H. admitted that Mother had relapsed on heroin while she had custody of her children. (*Id.* at 159). He never saw her use heroin in front of the children, however, and he was unaware of any heroin being kept in the home. (*Id.*).

{¶ 19} The final witness at the adjudicatory hearing was Mother. She testified that she had regained custody of her children by May 2010 after working on a case plan. (*Id.* at 167-168). Mother admitted relapsing on heroin in the summer of 2011. (*Id.* at 179-180). She testified, however, that her children never saw her use drugs. (*Id.* at 180). Mother explained that following her relapse in the summer of 2011, she and A.H. made arrangements for her children to spend time with other people, including L.I. and D.T. (*Id.* at 181).

{¶ 20} On cross examination, Mother admitted that she started using heroin every day in 2005. (*Id*. at 203). She claimed that she "got clean" in November 2005 and did not touch heroin again until the summer of 2011. (*Id*.). Mother then admitted that she had "relapsed" in 2009, using heroin then too. (*Id*. at 203-204). Mother added that she twice successfully had completed a relapse-prevention program. (*Id*. at 205). She also had completed three drug-rehab programs. (*Id*. at 208).

{¶ 21} Based on the testimony presented at the adjudicatory hearing, the trial court dismissed the neglect allegation but found S.A. to be a dependent child. (Doc. #55). In support, the trial court ruled from the bench as follows:

> The Appellate Courts have held that adequate parental
>
> care can be provided by a non-parent, and throughout the course

of this case and the Agency's involvement, [Mother] did make arrangements for other people to meet the needs of her children and provide appropriate care, so the Court is finding that there is not clear and convincing evidence that the children are neglected.

However, [Mother] has, the evidence is clear, [Mother] has relapsed on drugs. There is evidence about her physical condition when she's on drugs; nodding off, somewhat incoherent.

The testimony of the foster parents about their concerns, ongoing concerns about how the children will be being returned at any period of time for the last couple of months under the temporary care of [Mother] based upon what they had observed in terms of her condition and her acknowledged use again of drugs, and so that evidence establishes that the condition in [Mother's] household is not stable; the condition that they could be exposed to under her relapse state is not in their best interest or safety and, therefore, the Court is finding they are dependent. Because of their condition of environment, does warrant the State, in the interest of the children, in becoming involved in this family. So I am finding they are dependent.

(Tr. Vol. I at 226-227).

{¶ 22} After taking additional testimony at a dispositional hearing, the trial court

granted Paternal Aunt legal custody of S.A., awarded GCCS protective supervision of the child, and gave Mother parenting time. (Doc. #62). In a written judgment entry, the trial court made the following findings, which are supported by the record, concerning Paternal Aunt being awarded legal custody:

> * * * The agency completed a home study on [Paternal Aunt] and found the placement to be suitable. [Paternal Aunt] is employed full-time and has adequate financial resources to meet [S.A.'s] needs. [Paternal Aunt] has health insurance coverage and could place [S.A.] on her plan. The home has three bedrooms; [S.A.] would have her own bedroom. [Paternal Aunt] had regular contact with [S.A.] during the first three years of the child's life, after which the involvement dissipated. For at least a year prior to the filing of this action, [Paternal Aunt] had no contact with [S.A.]. The first visitation was awkward; all remaining visits have gone well and [S.A.] enjoys spending time with [Paternal Aunt]. [Mother] is opposed to [Paternal Aunt] getting legal custody because she feels that [Paternal Aunt] might impede [Mother's] contact with [S.A.], but [Mother] acknowledges that [S.A.] would be safe in [Paternal Aunt's] care. [S.A.'s imprisoned father] is in favor of [Paternal Aunt] getting custody. [Paternal Aunt] is willing to cooperate with CSB to ensure that [S.A.'s] needs are met.
>
> It is in [S.A.'s] best interest to be in the legal custody of [Paternal Aunt], and that the agency have protective supervision.

(Doc. #62 at 2-3).

{¶ 23} In her first assignment of error, Mother challenges the trial court's finding that

S.A. is a dependent child. She argues that such a finding is contrary to law and against the weight of the evidence.

**{¶ 24}** GCCS's complaint alleges that S.A. is a dependent child under R.C. 2151.04(B) and (C). The former subdivision defines a dependent child as one "[w]ho lacks adequate parental care or support by reason of the mental or physical condition of the child's parents, guardian, or custodian." The latter subdivision defines a dependent child as one "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship."

**{¶ 25}** The trial court's oral ruling makes clear that it found S.A. dependent under R.C. 2151.04(C). A trial court's dependency finding must be supported by clear and convincing evidence. *In re P. G.*, 2d Dist. Montgomery No. 22706, 2008-Ohio-4015, ¶ 11. This court's review is limited to determining whether the record contains sufficient credible evidence to support the trial court's decision. *Id.*

**{¶ 26}** On appeal, Mother contends the evidence does not support a dependency finding under R.C. 2151.04(C). She argues that a finding of dependency under this subsection "requires evidence that the parent's supervision of her children or the environment of her children has been affected in some negative way by the behavior of the parent." (Appellant's brief at 4). Although Mother admits relapsing on heroin, she contends GCCS presented no evidence that S.A. was adversely affected by her drug use. According to Mother, the only evidence "even remotely on this topic" involved L.I. observing her under the influence of drugs one night while S.A. and A.G. were home. Mother stresses that on this occasion, her friend T.P. was present caring for the children and getting A.G. ready for bed. In her reply brief, Mother contends she or her boyfriend always made arrangements for someone to care

for the children when she was dealing with her heroin addiction. Therefore, she asserts that the evidence does not support a dependency finding under R.C. 2151.04(C).

{¶ 27} Upon review, we agree with Mother that there is not strong evidence that her drug addiction resulted in S.A. receiving inadequate care. The trial court reached the same conclusion, recognizing that Mother made "arrangements for other people to meet the needs of her children and provide appropriate care[.]" (Tr. Vol. I at 226-227). The trial court nevertheless found S.A. dependent based on its concern that the child would return to Mother's house and be placed in an environment that, in Mother's relapsed state, was not "in [S.A.'s] best interest or safety." (*Id.*). The issue thus presented is whether the trial court properly made a dependency finding based, in large part, on a prospective determination that S.A. would be in an unstable and harmful environment if placed in Mother's home.

{¶ 28} Mother cites *In re Riddle*, 79 Ohio St.3d 259, 262, 1997-Ohio-391, 680 N.E.2d 1227, wherein the Ohio Supreme Court recognized that "a child who is receiving proper care pursuant to an arrangement initiated by the parent with a caregiver is not a dependent child under R.C. 2151.04(A)." She also cites, inter alia, *In re O.H.*, 9th Dist. Summit No. 25761, 2011-Ohio-5632, wherein the appellate court noted that an "adjudication under R.C. 2151.04(C) requires evidence that the parent's conduct is having 'an adverse impact upon the child sufficiently to warrant state intervention.'" *Id.* at ¶ 8, quoting *In re Burrell*, 58 Ohio St.2d 37, 39, 388 N.E.2d 738 (1979). The Ninth District also recognized that "[a] dependency finding based on a parent's use of an illegal substance or the abuse of a legal substance under either R.C. 2151.04(B) or (C) requires 'some evidence that [the parent's] supervision of her children or the environment of her children has been affected in some negative way' by the behavior of the parent." *Id.* at ¶ 9 (citations omitted).

{¶ 29}  Although *Riddle* addressed dependency under R.C. 2151.04(A), the principle that a child is not "dependent" if she is receiving adequate care from an alternate caregiver has been extended to cases arising under R.C. 2151.04(C). In *In re Stoll*, 165 Ohio App.3d 226, 2006-Ohio-346, 845 N.E.2d 581 (3d Dist.), for example, the Third District Court of Appeals reasoned:

> The Supreme Court of Ohio has specifically approved the Tenth District's rationale "at least insofar as R.C. 2151.04(A) is concerned." *In re Riddle*, 79 Ohio St.3d at 263, 680 N.E.2d 1227. In *Riddle*, the court stated, "A child who is receiving proper care pursuant to an arrangement initiated by the parent with a caregiver is not a dependent child under R.C. 2151.04(A)." *Id.* Since the court's determination in *Riddle* is limited to 2151.04(A), the court has not specifically determined whether the Tenth District's rationale should be applied with respect to R.C. 2151.04(B) through (D). Finding the Tenth District's rationale persuasive, we apply that rationale to the case before us.
>
> Here, Caldwell voluntarily relinquished control of the children to her parents prior to entering drug rehabilitation. At that point and up until now, both Khonner and Khyler have been receiving proper care, support, and custody from their maternal grandparents. In fact, both the trial court and DJFS found that the grandparents have been able to provide a stable environment where the children feel safe and have been receiving proper care. And as the Tenth District has stated, "[T]he state's interest under Section 2151.04, Revised Code, arises only if there is no one who is meeting the obligations of care, support and custody, which are owed by the parent." *In re Darst*, 117

Ohio App. at 379, 24 O.O.2d 144, 192 N.E.2d 287. * * * [W]hen determining dependency under R.C. 2151.04(C), "[T]he children's condition or environment must be such as to warrant interference by the state." *In re Darst*, 117 Ohio App. at 379, 24 O.O.2d 144, 192 N.E.2d 287. The condition at the time of the hearing was and had been adequate, and their environment was equally adequate, because of the Lambs' care. Accordingly, R.C. 2151.04(C) has no application.

*Id.* at ¶ 24-25.

{¶ 30} A dissenting judge in *Stoll* disagreed with the foregoing analysis. Specifically, Judge Stephen Shaw rejected the notion that placing a child with an alternate caregiver who provides for the child precludes a dependency finding under R.C. 2151.04(C). He reasoned, in part:

Neither R.C. 2151.04 nor R.C. 2151.03 address whether a child who is receiving proper care from relatives to whom the parent entrusted the child's care is deemed not to be a dependent or neglected child. In *In re Riddle*, 79 Ohio St.3d 259, 680 N.E.2d 1227, a children's services board caseworker mediated an agreement to address the child's care when the father acknowledged that he was not providing proper care for his son. A contract was signed by the mother, the father, the paternal grandparents, and the caseworker, explaining the parents' problems regarding their care for their son. *Id.* Specifically, the Supreme Court held that the child was receiving proper care pursuant to an arrangement initiated by the parent with another person. *Id.* In so holding, the court stated that "the parent's voluntary act of temporarily placing

the child with a responsible relative is an indicator of proper parental care, and does not support a finding that the parent is at fault. Therefore, the care furnished by the relative can be imputed to the parent." *Id.* at 263, 680 N.E.2d 1227. (Emphasis added.) The Supreme Court did not determine whether this doctrine should be applied to R.C. 2151.04(B) through (D).

In the case at hand, none of the factors relied upon in *Riddle* are present. First, Kara Stoll did not initiate any arrangement to have her children, Khyler and Khonner, stay with the maternal grandparents. On the contrary, the record reveals that Rick Lamb, Kara's father, came into the home regarding a phone call he received from his son, who was living with Kara, regarding broken water pipes. When he arrived, he shut the water off and entered Kara's home, where he found the house in disarray and smelled a very strong odor near the refrigerator. Once he walked into the living room, he started talking to his son about the smell, and he was told that Kara wanted to go to drug rehabilitation. Rick replied that they were leaving the house and he was taking the grandchildren, because he was concerned about their health due to the smell that was emanating from the refrigerator. Kara and Rick argued, with Rick stating that he was taking the kids and Kara stating that she was not going. Rick then removed the children from the home and informed Kara that if she didn't want to go, then he was going to call the police, because he felt that somebody was going to get hurt in the house. While Kara eventually acquiesced in her parents' taking the children, she did not voluntarily initiate this circumstance. In fact, it is the Department of Job and Family Services that first requested an

order of temporary custody with the maternal grandparents in its complaint filed on December 22, 2004.

In addition, there is no evidence as to the alleged "arrangement" for the proper care of the children in this case. On the contrary, and in marked contrast to the contract noted in *Riddle*, the record here demonstrates little more than a spur-of-the-moment, involuntary relinquishment of the children to the grandparents' care due to the insistence of the grandparents during an ongoing crisis. The fact that the relinquishment was eventually agreed to by the parent does not make it rise to the level of a contract or plan, or even to the level of the informal arrangement noted in *Riddle* and the appellate decisions addressing this issue.

This matter is important because a proper "arrangement" of this nature implies at a minimum some written permission from the parent in order to enable the alternative caregiver to make appropriate decisions—medical, school or otherwise—regarding the children. Thus, a formal guardianship or other form of contract, stating the terms of the arrangement by which the parent was relinquishing her rights to her parents for a certain period of time and for a particular reason, could be important to the proper care of the children and to the appropriate monitoring of the plan by the children's services agency where necessary.

However, even assuming that some kind of informal arrangement could be construed in this case, such an agreement should be merely one factor, or as noted in *Riddle*, *an indicator* for the trial court to consider when determining

whether sufficient alternative care was provided for the children by the parent, so as to defeat a complaint for dependency and neglect. In the circumstances before us, it is my opinion that this court should give greater deference to the resolution of this question by the trial court—especially in view of the fact that Kara agreed to a finding of dependency.

*Id.* at ¶ 34-38 (Shaw, J., dissenting).

{¶ 31} With the exception of Judge Shaw's dissent, the cases cited above lend support to Mother's argument. But those cases also are in some tension with another line of cases holding that a trial court need not allow a child to be placed in a potentially harmful environment. Indeed, this court has recognized "that a trial court can properly make a finding of dependence based upon a prospective determination, pursuant to R.C. 2151.04, that the child will be dependent[.]" *In the Matter of Lewis*, 2d Dist. Clark No. 95-CA-115, 1996 WL 748260, *3 (Dec. 27, 1996). "'The underlying reasoning * * * appears to be that as a dependency hearing focuses on the total environment, a court should look not only to the child's present condition but also to the child's potential future environment. * * * By focusing on the environment, which can be viewed and evaluated with or without the child, the legislature has chosen to permit the state to intercede in familial affairs at [an] early stage.'" *Id*. at *4, quoting *In the Matter of Likens*, 2d Dist. Greene No. 85-CA-80, 1986 WL 11910 (Oct. 24, 1986).

{¶ 32} We note, however, that in both *Likens* and *Lewis* there was evidence that the children were about to be placed in the challenged environment. In *Likens*, the biological father, David Likens, was attempting to regain custody of his child, Kelli Likens, from the child's step-mother, Beverly Likens. We upheld a finding that the child was "dependent"

under R.C. 2151.04, despite the fact that Beverly was providing good care. We reasoned: "[A]lthough it appears that Kelli's physical needs were being met at the time of the hearing, there was evidence to show that her psychological development would suffer were she to be placed in the care of David Likens." *Likens* at *9.

{¶ 33}   In *Lewis*, the child at issue had been placed in temporary foster care due to the mother's poor care for the child. Mother subsequently sought to have the child returned to her. This court upheld a finding of dependency, however, based on a prospective determination that the child would be "dependent" under R.C. 2151.04 if she were returned to mother's care. In so ruling, we noted that findings of dependency had been upheld in cases involving newborn infants based on their potential future environment if they were allowed to go home. *Lewis* at *3-5; *see also In re Reese*, 12th Dist. Butler No. CA98-08-169, 1999 WL 225149, *4 (April 19, 1999) ("The State need not subject a child to a potentially detrimental environment. Ohio courts have held that newborn infants can be dependent even before they have been in their parents' custody. * * * Similarly, the trial court could find that D'Anna was dependent before subjecting her to the risk that appellant would allow Reese to return to her home while D'Anna was present.").

{¶ 34}   In a more recent case, *In re P.G.*, 2d Dist. Montgomery No. 22706, 2008-Ohio-4015, this court upheld a dependency finding under R.C. 2151.04(C) based on the mother's history of mental health and substance abuse issues, her past inconsistencies in obtaining treatment, and her previous loss of custody of four other children. In that case, MCCS had obtained permanent custody of the mother's four children in 2006 based on her homelessness, mental-health issues, substance-abuse problems, unemployment, and failure to complete a case plan. *Id.* at ¶ 2. Another child, P.G., was born in June 2007. Two months later,

MCCS filed a dependency complaint. A subsequent hearing revealed that the mother's circumstances had improved significantly since 2006. *Id.* at ¶ 3-5. She had been treated successfully for a mental disorder and substance abuse. She had obtained proper housing and had ended a troubled personal relationship. She was living with P.G.'s father and had obtained employment. MCCS had no specific concerns about P.G., who was healthy. *Id.* Despite these positive facts, this court upheld a dependency finding, reasoning:

> The trial court's decision discusses both R.C. 2151.04(C) and(D), but it is unclear whether the court found one or both of these sections to be satisfied. It is clear, however, that the court found P.G. to be a dependent child under R.C. 2151.04 based on Melissa's mental health and substance abuse issues, her past inconsistency in addressing those issues, and the resulting loss of custody of four other children. In our view, the trial court did not abuse its discretion in concluding that these circumstances justified a finding of dependency under either R.C. 2151.04(C) or (D).

*Id.* at ¶ 25.

{¶ 35} In light of our decision upholding a dependency finding in *In re P.G.*, we cannot say the trial court erred in finding S.A. dependent here. The dependency finding in *In re P.G.* was based on nothing more than mother's past problems and a concern that she might relapse. We upheld the dependency, finding an absence of evidence of any current deficiencies in the child's condition or environment.

{¶ 36} The facts of the present case present an even stronger argument for a dependency finding. As set forth above, Mother was in the midst of a drug relapse for at least the third time. She admitted at the adjudicatory hearing that she was addicted to heroin. S.A.

had been removed from her care multiple times before, and mother previously had completed various drug- and relapse-prevention programs only to relapse again. She had track lines everywhere, was fading in and out, and even appeared to avoid her temporary caregivers. In addition, the record contains some evidence that Mother's drug use had an impact on her children. Foster mother L.I. testified that she had seen S.A. in Mother's presence while Mother was under the influence of drugs. The record also supports a reasonable inference that Mother either used or kept heroin needles at her home. If the mother's prior history in *In re P.G.* supported a finding of dependency, the facts in the present case are even more compelling.

{¶ 37}  Finally, we agree with Judge Shaw's dissenting opinion in *Stoll* that a parent's reliance on an alternate caregiver does not necessarily preclude a dependency finding under R.C. 2151.04(C). In the present case, it is not clear that Mother always arranged for an alternate caregiver to look after S.A. But even if she did, the "arrangement" that existed was informal. With little notice or planning, L.I. would pick up S.A. for an ill-defined period of time until Mother decided she wanted the child back. Foster mother D.T. engaged in the same process with A.G.  L.I. testified that she feared returning S.A. to Mother's care while mother was in the midst of fighting her drug addiction. This fear was not unfounded given the number of times S.A. had been shuttled between Mother and L.I. at Mother's sole discretion.

{¶ 38}  As Judge Shaw noted in his *Stoll* dissent, "a proper 'arrangement' * * * implies at a minimum some written permission from the parent in order to enable the alternative caregiver to make appropriate decisions—medical, school or otherwise—regarding the children. Thus, a formal guardianship or other form of contract, stating the terms of the arrangement by which the parent was relinquishing her rights to her parents for a certain period of time and for a particular reason, could be important to the proper care of the

children[.]" *Stoll* at ¶ 37 (Shaw, J., dissenting). No such formal arrangement existed here, and its absence created a problem when D.T. attempted to have A.G. treated for her MRSA infection and admitted to the hospital.

{¶ 39} Finally, as Judge Shaw correctly observed, arranging for an alternate caregiver is merely one factor or "*an indicator* for the trial court to consider when determining whether sufficient alternative care was provided for the children by the parent, so as to defeat a complaint for dependency and neglect." *Id.* at ¶ 38. When viewed in conjunction with the other evidence in the record, Mother's periodic reliance on L.I. to help care for S.A. did not preclude the trial court from finding the child dependent under R.C. 2151.04(C). Having reviewed the evidence presented at the adjudicatory hearing, we find sufficient credible evidence to support the trial court's dependency finding. Accordingly, Mother's first assignment of error is overruled.

{¶ 40} In her second assignment of error, Mother claims the trial court erred in awarding legal custody of S.A. to Paternal Aunt. Mother contends this disposition was not in S.A.'s best interest and was unreasonable in light of other available options. Specifically, Mother asserts that Paternal Aunt lacked a significant relationship with S.A. and was not well bonded with the child. Mother argues that the trial court should have continued temporary custody with GCCS and placed S.A. in foster care with L.I.

{¶ 41} A juvenile court has broad discretion in the disposition of an abused, neglected, or dependent child. *See* R.C. 2151.353(A) and Juv.R. 29(D). The dispositional options include, among other things, granting a children-services agency temporary custody, committing the child to the permanent custody of a children-services agency, or awarding legal custody to a relative or any other person. R.C. 2151.353(A). "In choosing among the

alternatives, the best interest of the child is the court's primary consideration." *In re L.C.*, 2d Dist. Clark No. 2010 CA 90, 2011-Ohio-2066, ¶ 13.

{¶ 42} Upon review, we see no abuse of discretion in the trial court's decision to award Paternal Aunt legal custody.[1] The dispositional-hearing transcript reflects that Paternal Aunt had four grown children in college. (Tr. Vol. I at 245). Paternal Aunt had enjoyed some involvement in S.A.'s life early on. (*Id.* at 244). She began seeing S.A. less frequently, however, when the child's father (Paternal Aunt's brother) went to prison. Paternal Aunt received visitation time with S.A. when the proceedings below commenced. Her time with S.A. increased to overnight visitation before she was awarded legal custody. (Tr. Vol. II at 326). The record reflects that the overnight visits were "really good" and that S.A. enjoys her time with Paternal Aunt. (*Id.* at 326, 352). For her part, foster mother L.I. acknowledged that Paternal Aunt loves S.A. (*Id*. at 259). Mother testified that she did not believe S.A. should live with Paternal Aunt because she wanted the child to live with her. (*Id*. at 398). Mother did not express any specific concerns, however, about S.A.'s safety or care if Paternal Aunt obtained legal custody. (*Id*.). Finally, GCCS expressed no concerns about S.A. living with Paternal Aunt, and a home study was approved. (*Id.* at 329-330). GCCS also did not oppose the trial court awarding Paternal Aunt legal custody. (*Id.* at 331). GCCS did request an order of protective supervision, however, which the trial court granted. (Tr. Vol. II at 331; Doc. #62 at 3).

{¶ 43} Although Mother favored granting GCCS temporary custody and placing S.A.

---

[1] Parenthetically, we note that a grant of "legal custody" is not "permanent custody." Legal custody does not divest a parent of residual parental rights, privileges, and responsibilities. *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, ¶ 17. Because Mother's parental rights have not been terminated, she still may regain custody of S.A. in the future. *Id.*

in foster care with L.I., we cannot say the trial court abused its discretion in awarding legal custody to Paternal Aunt. An "abuse of discretion" is exhibited in a ruling that is unreasonable, arbitrary, or unconscionable. *In re M.P.*, 2d Dist. Greene No. 2011 CA 71, 2012-Ohio-2334, ¶ 10. It is not enough that a reviewing court might have reached a different conclusion if it were deciding the issue de novo. *Id.* Although the trial court reasonably could have elected to grant GCCS temporary custody and to place S.A. in foster care, the record does not support a finding that it abused its discretion by awarding legal custody to Paternal Aunt. Accordingly, Mother's second assignment of error is overruled.

{¶ 44} In her third assignment of error, Mother claims the trial court erred in finding that drug use rendered her unable to provide adequate, consistent care for S.A. Mother notes that she has admitted her drug problem and has sought treatment. She points out that she is a good mother when not under the influence of heroin. She also stresses that she placed S.A. with alternate caregivers when she experienced a drug relapse. In light of these facts, Mother contends there is no evidence that S.A.   lacked proper care.

{¶ 45} Having reviewed Mother's third assignment of error, we find that it is, in essence, a rehash of portions of her first assignment of error. Her arguments about being able to care for S.A. when not under the influence of heroin and about providing alternate care when she relapses are pertinent to the trial court's dependency adjudication, an issue we fully addressed above.

{¶ 46} In light of our determination, supra, that the trial court did not err in (1) adjudicating S.A. dependent and (2) awarding legal custody to Paternal Aunt, nothing remains for us to decide. In our analysis above, we recognized that Mother was a good caregiver when not under the influence of heroin. We also recognized that she placed S.A. with an alternate

caregiver when she relapsed. Mother's third assignment of error is overruled because it essentially repeats arguments related to the dependency issue.

{¶ 47} Based on the reasoning set forth above, the judgment of the Greene County Common Pleas Court, Juvenile Division, is affirmed.

. . . . . . . . . . . . .

FAIN and DONOVAN, JJ., concur.

Copies mailed to:

Stephen K. Haller
Nathaniel R. Luken
Jennifer S. Getty
Hon. Robert W. Hutcheson